UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LEE AYERS,<br><br>  Defendant. | Criminal Action No. 08-364 (JDB) |

## MEMORANDUM OPINION

  In many ways, Lee Ayers has locked himself in. He locked himself into legal trouble when he committed a series of crimes that led to both state and federal convictions. He locked himself into a twelve-year prison sentence by agreeing to it in a plea deal. And he locked himself into a sentencing date that happened to occur a month before a landmark bill reducing mandatory minimum sentences was passed into law. Now, Ayers has collaterally attacked his sentence, claiming that his trial counsel rendered ineffective assistance because she did not seek to continue his sentencing until after passage of the Fair Sentencing Act (FSA). His argument is not without appeal. However, for the reasons explained below, the Court will deny his claim.

### I. BACKGROUND

  Ayers was arrested on September 6, 2008, after attempting to flee officers of the District of Columbia Metropolitan Police Department (MPD) who were conducting a traffic stop of his car. Indictment [ECF No. 1] at 1; United States v. Ayers, 795 F.3d 168, 170 (D.C. Cir. 2015). Ayers accelerated away from the MPD officers, drove the wrong way down a one-way street, lost control of his car, and crashed. Ayers, 795 F.3d at 170. When MPD officers searched his car, they found 98.1 grams of cocaine base (crack cocaine), a Glock 27 pistol, a Beretta 9mm pistol,

1

.40 caliber auto cartridges, .38 special cartridges, a glass cooking pot with cocaine residue, $3,800 in cash, zip-lock bags, and a small quantity of marijuana. Id. at 170–71; see Indictment at 1–3.

A federal grand jury indicted Ayers on four charges: possession with intent to distribute fifty or more grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii); using, carrying, and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); and two counts of unlawful possession of a firearm and/or ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1). Indictment at 1–3. On April 1, 2010, Ayers entered into a plea agreement, which required him to plead guilty to the possession with intent to distribute offense—which carried a 120-month mandatory minimum—and to agree to a sentence of 144 months. See Plea Agreement [ECF No. 44] at 1–2. In exchange, the government dropped the other three charges—one of which carried a five-year mandatory minimum of its own—though Ayers had to acknowledge that the government had a factual basis for those claims, as well. See id. at 2, 4. The government also agreed to dismiss the sentence enhancements it had sought, see id. at 4, which would have doubled the mandatory minimum for Ayers's guilty plea due to his history of drug offenses. The agreement allowed Ayers to argue at sentencing that part or all of his sentence should run concurrently to any other sentence he was serving, and allowed the government to oppose concurrent sentencing. See id. at 2. Ayers was already serving a nine-year sentence imposed by the D.C. Superior Court for an assault charge stemming from a shootout. See Def.'s Mem. in Aid of Sentencing [ECF No. 49] at 8; Sentencing Tr. [ECF No. 79] at 21:4–:9.

Ayers pleaded guilty in open court on April 1, 2010, see Min. Order of Apr. 1, 2010; Tr. of Plea Hr'g [ECF No. 80] at 25:13–26:19, and the Court deferred a decision on the plea agreement, Tr. of Plea Hr'g at 23:11–:25. Ayers's attorney, Michelle Peterson, asked the Court to postpone sentencing until "toward the end of July": "[p]art of [her] argument" for concurrent sentencing

2

was to "be based on the changes in the crack cocaine laws," so she wished to "have till the end of July to see how that's developing." Id. at 27:10–:18. The Court could not schedule a hearing for the end of July due to scheduling concerns, and suggested either much earlier in July or mid-August. Id. at 27:19–:21. Peterson responded that mid-August did not work for her and said "it would have to be the beginning of September." Id. at 27:22–:23. The Court asked whether that was her request. Id. at 27:24. After consulting with Ayers, Peterson said: "Early July would be fine then, Your Honor." Id. at 27:25–28:2. The Court set the sentencing hearing for July 9, see id. at 28:21–29:3, and Ayers was sentenced on that date to the agreed-upon 144 months, Sentencing Tr. at 38:1–:3. The Court rejected Peterson's argument for concurrent sentencing, running Ayers's sentence consecutive to his Superior Court sentence. Id. at 41.

As Ayers pleaded guilty and approached sentencing, the FSA was winding its way through Congress. The FSA was introduced in the Senate on October 15, 2009, but senators did not reach a compromise and pass the bill through the Senate Judiciary Committee until March 11, 2010. See Library of Congress, S.1789 - Fair Sentencing Act of 2010, Congress.gov [hereinafter "FSA Enactment History"] (last updated Aug. 3, 2010), https://www.congress.gov/bill/111th-congress/senate-bill/1789/all-actions-without-amendments. The full Senate passed it by voice vote on March 17. Id. The House of Representatives passed the FSA on July 28, and President Barack Obama signed it on August 3. Id. During sentencing, Peterson pointed to the changes Congress appeared to be making to the crack/powder disparity as an argument for running at least part of Ayers's sentence concurrently. See Sentencing Tr. at 18:6–:17, 20:19–:24. Though the FSA had passed the Senate, and would eventually become law less than a month after Ayers's sentencing, Peterson did not seek a continuance of the sentencing date to wait for the possible passage of the FSA.

3

Ayers appealed his sentence, but the D.C. Circuit affirmed in July 2015. Ayers, 795 F.3d at 177–78. In February 2016, the D.C. Circuit decided United States v. Abney, 812 F.3d 1079 (D.C. Cir. 2015), holding that a defendant had a meritorious ineffective assistance of counsel ("IAC") claim when his attorney had failed to seek a continuance of his sentencing hearing, which took place after the House had passed the FSA and the day before the President signed it into law. On August 26, 2016, armed with the Abney decision, Ayers filed a motion to vacate his sentence under the federal habeas statute, 28 U.S.C. § 2255. See Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Mot. to Vacate") [ECF No. 59].[1] The Court ordered that Ayers be appointed counsel. See Min. Order of Nov. 29, 2016. The government opposed Ayers's habeas motion, see U.S.'s Opp'n to Def.'s Pro Se Mot. Under 28 U.S.C. § 2255 ("Opp'n") [ECF No. 62], Ayers filed a reply, see Def.'s Reply [ECF No. 77], and the government filed a surreply, see U.S.'s Surreply [ECF No. 78]. The Court ordered an evidentiary hearing, see Scheduling Order [ECF No. 69], and after multiple delays two hearings were held on November 27 and December 12, 2017, see Evid. Hr'g Tr. [ECF Nos. 84, 88]. After the evidentiary hearings, both parties filed final briefs. See Def.'s Br. in Supp. of His Mot. Under 28 U.S.C. § 2255 ("Def.'s Br.") [ECF No. 93]; U.S.'s Final Opp'n to Def.'s Mot. Under 28 U.S.C. § 2255 ("U.S.'s Final Opp'n") [ECF No. 92]. A final motions hearing occurred on February 16, 2018.

## II. LEGAL STANDARD

A federal prisoner may bring a habeas corpus action in district court "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

---

[1] Since Ayers's time to file a petition for certiorari did not run out until October 2015, his habeas petition fell within the one-year statute of limitations. See 28 U.S.C. § 2255(f).

4

While "the general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice," defendants may bring IAC claims for the first time on collateral review without having to meet these standards. Massaro v. United States, 538 U.S. 500, 504, 509 (2003). Instead, IAC claimants "must show [1] 'that counsel's performance was deficient' such that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment' and [2] that 'the deficient performance prejudiced the defense.'" United States v. Glover, 872 F.3d 625, 630 (D.C. Cir. 2017) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). A court may deny an IAC claim on either of these two prongs without addressing the other. See Strickland, 466 U.S. at 697.

### III. DISCUSSION

Ayers claims that Peterson rendered ineffective assistance by failing to seek a continuance of his sentencing until after the FSA became law. Ayers also makes the alternative argument that he should be resentenced "in the interests of justice." The Court addresses these arguments in turn.

#### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Ayers's main contention is that his trial attorney, Michelle Peterson, rendered ineffective assistance of counsel in violation of the Sixth Amendment. The government contests both the idea that Peterson's performance was deficient and the claim that her failure to seek a continuance resulted in prejudice to Ayers. Ultimately, however, the Court need not reach the second prong of the Strickland test, because the Court finds that Ayers has failed to satisfy the first.

To make out a successful IAC claim, a defendant must prove that his counsel was deficient. Under Strickland, "[t]he proper measure of attorney performance" is "reasonableness under prevailing professional norms." 466 U.S. at 688. Thus, an attorney's performance is deemed deficient if it "falls below an objective standard of reasonableness." Abney, 812 F.3d at 1086. To

5

make this showing, "a 'defendant must overcome the [strong] presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Id. at 1087 (alteration in original) (quoting Strickland, 466 U.S. at 689). Because an attorney's strategy almost never becomes an explicit part of the record, "th[is] presumption may only be rebutted through a showing that no sound strategy posited by the [opposing party, here the government] could have supported the conduct." Id. (quoting Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005)). A court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. As might be surmised from the tenor of these standards, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id.

Ayers claims that Peterson's performance was deficient because she "knew that the implementation of the [FSA] was on the horizon" at the time of Ayers's July 9 hearing, yet, "[d]espite this, [she] went forward with the sentencing." Def.'s Reply at 7–8. Ayers asserts that he had nothing to lose by waiting, but could have strengthened his argument for concurrent sentencing by doing so, and that therefore there was no strategic justification for Peterson's not having sought a continuance. Id. at 8. The government argues that Peterson's actions could have been based on a tactical choice, and that in any event her decision not to seek a continuance was reasonable. See U.S.'s Final Opp'n at 11–12; U.S.'s Surreply at 5–6.

Ayers's deficiency argument turns almost entirely on the Abney decision; therefore, a thorough summary of that case is in order. Abney pleaded guilty to one count of possession of fifty grams or more of cocaine base with intent to distribute. Abney, 812 F.3d at 1083. Due to a series of continuances, Abney was sentenced on August 2, 2010—five days after the House had passed the FSA and the day before President Obama signed it into law. Id. at 1083–84. The FSA

increased the amount of cocaine base subject to certain mandatory minimums, such that the amount that Abney pleaded to possessing would receive only a five-year minimum under the FSA as opposed to the ten-year minimum to which he was subject when sentenced. Id. Abney's counsel did not seek a continuance, and indicated that he believed the FSA would not be applied retroactively to individuals who committed crimes before the bill became law, even though under the Sentencing Reform Act of 1984 the applicable Guidelines are those in effect at the time of sentencing. Id. at 1084. The D.C. Circuit reversed the district court's denial of Abney's motion to reconsider his § 2255 motion, which had made an IAC claim. Id. at 1083.

The court first determined that the government's "proffered strategic rationales are implausible," and that, "[o]n this record, . . . there is no conceivable strategy that would justify the failure of Abney's counsel to seek a continuance of sentencing." Id. at 1088. The court therefore looked to whether a reasonable attorney would determine that there was a reasonable probability of successfully reducing Abney's sentence by seeking a continuance. See id. It found that "[t]he FSA's impending enactment was so important and widely publicized—and the reasonable likelihood of its retroactive effect so apparent—that objectively reasonable counsel would have known about it and the open retroactivity question," and therefore would have sought a continuance. Id. Both the district court and the government had recognized at sentencing that the FSA might be deemed retroactive, such that a shorter sentence for Abney may have been possible based on the FSA alone if he were sentenced later. See id. And the defense bar was seeking continuances for similarly situated defendants at the time, which indicated that Abney's counsel's performance was unreasonable as measured by professional norms. See id. at 1088–89. "In view of counsel's 'overarching duty to advocate the defendant's cause,'" the court held, "Abney's counsel could not remain silent when there was a substantial sentencing benefit—a five-year

7

reduction in the mandatory minimum—that was reasonably likely to apply to his client if his sentencing were postponed." Id. at 1090 (citation omitted). Counsel was therefore deficient. As a "reasonable, conscientious, and impartial district court would have granted" a continuance, the deficiency was also prejudicial, and Abney therefore had a meritorious IAC claim. Id. at 1093.

This case differs from Abney in several crucial ways, and these differences prove fatal to Ayers's IAC claim. To begin with, Ayers was sentenced pursuant to an agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). As will be discussed further below, this meant that, once the Court accepted his plea, it was bound to accept the 144-month sentence outlined in the agreement. Thus, while Abney's sentence would have changed after passage of the FSA, Ayers's sentence could not. The only debate at sentencing was over whether that sentence would run consecutively or concurrently with Ayers's existing Superior Court sentence.

In part because of the 11(c)(1)(C) plea, this case also differs from Abney because there are plausible tactical reasons not to have sought a continuance. "[A]bsent a strategic decision by counsel, the ineffectiveness prong of Strickland turns on whether an objectively reasonable attorney would have [sought a continuance] because the issue had a reasonable likelihood of success." Abney, 812 F.3d at 1088 (alterations in original) (quoting Payne v. Stansberry, 760 F.3d 10, 14 (D.C. Cir. 2014)). Because the Abney court found that the government's proffered strategic considerations were implausible, that court's deficiency analysis focused on the likelihood that a continuance would result in a sentence reduction. In this case, however, we need not get that far, because Ayers likely cannot "overcome the [strong] presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 1087 (citation omitted).

There is evidence for two alternative courses of events in the record, either of which could have been the result of acceptable trial strategy. According to Ayers's § 2255 motion and his

8

testimony at the evidentiary hearing, Ayers had asked Peterson to file a motion to continue the July 9 sentencing, but when he asked her on July 9 what had happened to the continuance she said "she did not file it because the judge would not have granted it because the case has been going on too long." Mot. to Vacate at 5; accord Evid. Hr'g Tr. at 10:8–11:6. There is conflicting evidence on this claim, to say the least. Peterson testified that, while she could not specifically recall whether Ayers had requested a continuance, she never opposed a client's request for a continuance and she would have asked the Court for a continuance if he had asked her to do so. See Evid. Hr'g Tr. at 46:11–47:7, 58:8–:17, 60:8–:21, 62:17–:22. Ayers's appellate counsel, Beverly Dyer, claimed in response to questioning at the hearing that she "believe[d] he did say" that he had asked Peterson for a continuance and that she had not sought it. See id. at 99:11–:15, 100:23–101:1. But she was far from certain on this point. She also conflated Ayers telling her that he had asked for a continuance with Ayers telling her generally that he was upset he was not sentenced after the FSA.[2]

---

[2] The following two exchanges, the first with the government and the second with the Court, provide the best examples of Dyer's ambiguity on this point:

> Q. All right. At any time during your representation of Mr. Ayers, do you ever recall Mr. Ayers complaining about the quality of Ms. Peterson's representation?
>
> A. I don't remember it in those terms. I do remember that he was frustrated about the – a continuance and the Fair Sentencing Act.
>
> Q. Okay. You said you knew he was upset about the continuance. What do you mean by that?
>
> A. That he would have – he would have wanted – he wanted to be sentenced under the Fair Sentencing Act. It's something that he was concerned about throughout his case.
>
> Q. Right, but did he ever complain to you, in the course of your representation, about the quality of Ms. Peterson's representation as it pertains to the continuance and the passage of the Fair Sentencing Act?
>
> A. I don't recall him complaining about the quality of her representation.

Evid. Hr'g Tr. at 79:19–80:10.

> [THE COURT:] Did Mr. Ayers say to you at any time . . . that he had requested a continuance from Ms. Peterson but she had declined to seek it?
>
> THE WITNESS: I believe he did say that.
>
> THE COURT: And what do you think he told you? I mean, as best you can recall, what would he have told you?

Given the mixed evidence as to whether Ayers asked Peterson to request a continuance, Ayers argues that the Court need not decide whether he actually made the request, because Peterson should have sought a continuance in any event. Def.'s Br. at 11–12. As the Court finds Peterson's testimony more credible than Ayers's, the Court must indeed determine whether Peterson should have sought a continuance on her own. As part of this inquiry, however, Ayers must still rebut the government's proffered rationales for going forward with the July 9 sentencing. In its briefs and in the evidentiary hearings, the government has suggested that Peterson sought to take advantage of the uncertainty around what a final FSA might look like, so Ayers could benefit from the atmosphere of legislative change to the mandatory minimum regime without the possible cost to his arguments if the final FSA turned out not to be that helpful to defendants like him. See Evid. Hr'g Tr. at 26:10–29:22, 45:7–:13, 47:8–48:17, 53:4–:23, 101:7–102:5; U.S.'s Final Opp'n at 12; U.S.'s Surreply at 3.

Ayers has not proven this proffered rationale implausible, and so has not "overcome the presumption that, under the circumstances, [not seeking a continuance] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted). Peterson and Dyer stated numerous times throughout their testimony that, due to the nature of Ayers's plea, the only benefit the FSA could provide Ayers was as another argument for concurrent sentencing. Evid. Hr'g Tr. at 42:16–:23, 45:7–46:2, 48:3–:21, 54:3–:18, 81:13–:22, 87:2–:7, 98:16–:23, 100:4–:18. Both also admitted that, at the time, they did not think the timing of the hearing would make much difference to the concurrent sentencing argument Peterson would make—or, at least, that there were costs

---

> THE WITNESS: The same way I recall him being very concerned about the Fair Sentencing Act and the crack/powder disparity throughout his case. I believe he expressed to me that he had given the same concerns to Ms. Peterson and that she had been aware of his concerns, that he had made those – the same concerns relevant to her or he had communicated them to her.

Id. at 99:11–:24.

and benefits to making the argument either before or after the FSA passed. Id. at 45:7–48:21, 53:4–:23, 56:9–57:10, 59:6–:19, 62:23–63:5, 81:13–:22, 83:6–:14, 85:7–:20, 87:2–88:6, 99:11–103:3. One example of such a statement came during the Court's questioning of Peterson:

> THE COURT: Did you believe that Mr. Ayers was likely to get a better sentencing result if sentenced after the passage of the FSA than if sentenced before the passage of the FSA?
> THE WITNESS: I don't – no, I can't say that I thought it would be better before or after, because I thought we had – everything we needed to make the argument as to why it should be concurrent was in play, with the possible exception of making the argument that it would have been a five-year mandatory doubled to ten with the enhancement papers . . . .
> But, obviously, if – had it already – had the mandatory minimums already come into place, maybe that would have been stronger, and if the Court would have reached a different result had the mandatory minimum only been five even though the 11(c) was still to 12, then yes, I think it would have been better for him to have waited.
> THE COURT: But you don't know whether you believed it would have been better or not?
> THE WITNESS: At the time I have no recollection because I don't remember when it became clear exactly what was happening on the Hill and what – I can't recreate in my mind exactly when things changed. I know the guidelines had changed. I don't remember whether it was clear that the mandatory minimum – when it was clear to us that the mandatory minimums had in fact changed.

Id. at 56:10–57:10. And, while Peterson could not recall what her reason was at the time for not seeking a continuance, she admitted that there could have been strategic reasons not to do so. See, e.g., id. at 45:11–:13 ("That is possible [that the pre-FSA ambiguity benefitted Ayers], yes. That is the only argument that was left to us, for court, was whether it should be concurrent or consecutive."). Peterson made similar admissions many times.[3] In the end, "the burden to 'show

---

[3] See Evid. Hr'g Tr. at 45:22–46:2 ("I had no reason to want to do it earlier or later. So it would have – I'm sure it would have been either because we thought there was something going on that would either make it more likely or less likely that we would be able to convince Judge Bates, but I would have followed the request of the client at that point."), 48:15–:21 ("The one [reason] you're suggesting [for accepting a July 9, 2010 sentencing date] is what makes the most sense, unless the client had a particular reason that he wanted to be sentenced."), 55:21–:24 ("Well, the advantage that Mr. Lucas suggested was perhaps there were some strategic reasons, if we weren't sure exactly what was going to be passed, that maybe we had a stronger argument."), 58:13–:16 ("I just don't remember what happened late July that made us think it was better to just go ahead as opposed to ask for a continuance. But, certainly, if I had been asked to ask for a continuance, I would have done so."), 64:12–:15 ("I know I knew what the law was at the time, and I knew what was going on on the Hill. I was paying attention to it. We made decisions, and we made our best pitch as to why we should have concurrent versus consecutive."), 66:11–:14 ("[O]bviously, if in fact there

11

that counsel's performance was deficient' rests squarely on the defendant," Burt v. Titlow, 571 U.S. 12, 22–23 (2013) (citation omitted), and Ayers has not met that burden.[4]

Even if one were to discount the government's proffered reasons for Peterson's not seeking a continuance, the differing legislative environments rendered Peterson's actions far more reasonable than Abney's counsel's. Unlike at Abney's sentencing on August 2, it was difficult to know, either at Ayers's plea on April 1 or his sentencing on July 9, 2010, whether the FSA had a likely or even a reasonable chance of passing. The Senate reached a deal and passed the FSA by unanimous consent on March 17, after having passed the bill out of the Judiciary Committee six days earlier. See FSA Enactment History. Prior to this sudden burst of activity, the FSA had languished in committee for five months. See id. After passing the Senate, the FSA was referred to two separate House committees; one of these committees took no action on the bill, while the other referred it to a subcommittee on June 15, 2010. Id. There was no outward indication by July 9 that the House would move the bill to the floor: the bill had not been scheduled for floor consideration, and indeed never was. See id. Instead, Representative Bobby Scott successfully moved to suspend the rules and pass the bill by voice vote on July 28. Id.

There must have been internal movement in the House before July 28 to set up this final vote. But nothing in the record suggests that a reasonable observer following the FSA's course through Congress would have thought the House was particularly likely to pass the bill in the final few weeks before the August recess in an election year. House Democrats "had previously

---

was a strong chance it wasn't going to be made retroactive, then we would have been better arguing that it was still a possibility that it was going to be retroactive and therefore you should apply it retroactively.").

[4] The government also made the plausible argument during the evidentiary hearing that, if the sentencing had been continued until after the FSA had been passed and the mandatory minimums had dropped, the Court could have rejected the plea agreement or the government could have withdrawn from the agreement because the basis of the bargain had been undermined. In either situation, the government could have then brought back its original charges, which could have saddled Ayers with a significantly higher sentence—and this was a possibility that could have led a reasonable attorney to have preferred a pre-FSA sentencing. See Evid. Hr'g Tr. at 52:18–53:3.

criticized the Senate-passed version" of the FSA for not fully reducing the crack-powder disparity, and had to be convinced "to move the upper chamber's version."[5]  Indeed, while a Washington Post editorial from July 21, 2010 claimed that "the House is expected to take up [the FSA] soon,"[6] a New York Times editorial four days later stated that the House "has been vacillating over whether or not to schedule a vote on the Senate bill."[7]

Peterson indicated during the November 2017 evidentiary hearing that her office was tracking the progress of the FSA, and responded "yes" when asked whether she had expected it to pass in late July 2010.  See Evid. Hr'g Tr. at 40:15–41:2.  Yet Peterson did not say as much during the sentencing hearing in 2010, stating only: "I know the Court is sentencing him today and not in the future, but we know that Congress is reducing these mandatory minimums as we speak." Sentencing Tr. at 18:8–:11.  This statement could have been spin, or a reference to the Senate's passage of the bill in March.  There was no indication at sentencing that Peterson believed Congress was going to pass the FSA later that month.  And, in any event, it would be unreasonable to require Peterson to have known the FSA would pass at a particular time to deem her effective, given the inconclusive evidence of legislative activity.  Indeed, the government and the Court both believed at the time that it was unclear whether the FSA would pass:

> THE COURT: Well, I think the problem is even though that might be an arguably accurate prediction for what this Congress would do if it got to the issue, we've got an election in November.  We have no idea what the Congress is going to look like after November, and it may not look like the Congress that we currently have.

---

[5] Lauren Victoria Burke & J. Taylor Rushing, Congress Passes Bill on Cocaine Sentencing Law Disparities, The Hill (July 29, 2010), http://thehill.com/homenews/house/111561-congress-passes-bill-on-cocaine-sentencing-laws.

[6] Editorial, House Can Reduce Powder Cocaine vs. Crack Cocaine Disparity, Wash. Post (July 21, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/07/20/AR2010072005364.html.

[7] Editorial, The House Should Listen and Learn, N.Y. Times (July 25, 2010), http://www.nytimes.com/2010/07/26/opinion/26mon3.html.

> MR. VARGHESE: That's exactly right, Your Honor. I think it would be disingenuous to try to use a concurrent sentence to try to evade what is the statute right now. And it may not or it might be the statute six months from now or a year from now, but we just don't know.

Id. at 28:4–:14.

Moreover, unlike in Abney, there appears to have been uncertainty at the time of sentencing as to what any final FSA bill would look like. During the evidentiary hearing, Peterson repeatedly said that she did not recall whether she knew at the time of sentencing if Congress was definitely planning to change the mandatory minimums for crack cocaine (and if so by how much). Evid. Hr'g Tr. at 45:15–:17, 47:8–:17, 55:19–57:10. At the sentencing hearing, Peterson noted the common understanding that Congress was looking to reduce the minimums, but did not indicate that she had any further knowledge about the contours of the specific proposals being considered by the House. See Sentencing Tr. at 18:8–:17. Thus, evaluating Peterson's conduct "from counsel's perspective at the time," Strickland, 466 U.S. at 689, there is nothing in the record to suggest that a reasonable attorney in Peterson's position would believe that seeking a continuance until early September (or any other time) would allow her to take meaningful advantage of legislative advancements.

This case therefore is unlike Abney, in which the defense "counsel was aware that the FSA had passed both houses of Congress," "it was well known that the President would promptly sign the legislation," and counsel "also contemplated that the FSA might be applied to benefit Abney." 812 F.3d at 1083–84. Instead, this case looks more like the cases Abney distinguished away, in which courts denied IAC claims against counsel who either did not ask for or did not receive continuances when the FSA's "enactment was anything but guaranteed." Id. at 1093.

Finally, unlike the plea in Abney, the plea here included a Rule 11(c)(1)(C) stipulation, in which the parties agreed on the sentence length ahead of time. This matters for two reasons. The

nature of the plea made it less likely that any difference in mandatory minimums brought on by the FSA would be relevant to Ayers's sentencing. As explained above, there did not appear to be much benefit to delaying sentencing, since the sentence itself was not at issue but rather only the question of concurrence with Ayers's Superior Court sentence. There was thus no "substantial sentencing benefit" from the drop in minimums "that was reasonably likely to apply to [Peterson's] client if his sentencing were postponed." Id. at 1090. The nature of the agreement also matters because the prevailing professional norm for those attorneys whose clients were being directly sentenced under the drug statutes did not exist for Rule 11(c)(1)(C) pleas. Defense attorneys were continuing sentencing hearings until after the FSA became law for clients similarly situated to Abney, id. at 1088–89; indeed, Peterson testified that "[i]f this had not been an 11(c)[(1)(C)] plea, then the call would have clearly been to continue and wait for the changes to occur," Evid. Hr'g Tr. at 42:13–:15. As Peterson put it, Ayers's situation was different because "with an 11(c) plea, whatever you can negotiate with the government is the best you're going to be able to get," and "[t]he government was not willing to change its 11(c)(1)(C) plea offer" here. Id. at 42:18–:23. Peterson did not recall being given any advice on this issue from the local or national bar, see id. at 42:24–43:4, and Ayers has not pointed to any examples of attorneys seeking continuances pending FSA passage in 11(c)(1)(C) cases.[8] Hence, Ayers has failed to show that Peterson's

---

[8] Dyer's testimony on cross-examination at the evidentiary hearing also lends support to the idea that Ayers's case differed from those in which the defense bar had sought continuances:

> Q. Isn't it true that at about the time that Mr. Ayers was being sentenced, or just prior to that, there were a number of attorneys who were seeking continuances so that their clients could take advantage of the Fair Sentencing Act?
>
> A. Absolutely.
>
> Q. Okay. So why is it that you did not think that was noteworthy in Mr. Ayers' situation?
>
> A. Because I didn't think his (c) plea would change, and because I thought that the same arguments would be – I thought those arguments would be equally compelling before and after with respect to whether the sentence could be concurrent.

Evid. Hr'g Tr. at 86:22–87:7.

conduct fell below an objective standard of reasonableness, as determined by prevailing professional norms.

Even if the Court credited Ayers's claim instead of Peterson's, Ayers's testimony suggests Peterson's decision not to seek a continuance was a tactical one. The question then becomes whether that decision was reasonable—and it was. "Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial." Taylor v. Illinois, 484 U.S. 400, 417–18 (1988) (footnote omitted). That Ayers wanted a continuance therefore does not alter the analysis, because "[s]cheduling matters are plainly among those for which agreement by counsel generally controls." New York v. Hill, 528 U.S. 110, 115 (2000); see also United States v. Hall, 610 F.3d 727, 741 (D.C. Cir. 2010) ("Where, as here, the record indicates a disagreement between the defendant and his counsel about trial strategy . . . the district court may properly view that as a matter for counsel to decide."). The overwhelming evidence from the record—particularly from the evidentiary hearings—is that Peterson would have made the exact same argument to the Court whether the FSA had passed or not, and that there were benefits and costs to either going ahead with sentencing or waiting for the FSA's passage. If Ayers's account is to be believed, then, Peterson had a sentencing argument that could be made at any time, determined that the Court would likely feel "the case has been going on too long," Def.'s Mot. at 5, and decided that it would be best not to risk frustrating the judge who had sole discretion over whether to run Ayers's sentence concurrently with his existing one. Such a decision does not fall "outside the wide range of professionally competent assistance," particularly since "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

For all of these reasons, reading the record in light of <u>Strickland</u> and <u>Abney</u>, the Court finds that Peterson was not deficient for not having sought a continuance. Ayers has not rebutted the strong presumption of reasonableness that <u>Strickland</u> sets in place. Hence, Ayers's IAC claim fails at the first step, and the Court need not determine whether Peterson's actions were prejudicial.

### B. Interests of Justice

Ayers also asserts, as an alternative to an IAC ruling, that the Court order resentencing "in the interests of justice." Def.'s Br. at 12; Def.'s Reply at 9. "Federal courts normally do not have the authority to modify a sentence once it has been imposed . . . ." <u>United States v. Butler</u>, 130 F. Supp. 3d 317, 319 (D.D.C. 2015), <u>aff'd sub nom.</u> <u>United States v. Jones</u>, 846 F.3d 366 (D.C. Cir. 2017). Indeed, federal law explicitly states that a "court may not modify a term of imprisonment once it has been imposed," subject to certain narrow exceptions. 18 U.S.C. § 3582(c); <u>see</u> <u>Dillon v. United States</u>, 560 U.S. 817, 824 (2010). Thus, "a court may modify a sentence only in three circumstances: (1) on motion of the Bureau of Prisons, (2) 'to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure,' and (3) to reflect a post-sentence reduction in the applicable sentencing guidelines." <u>United States v. Morris</u>, 116 F.3d 501, 504 (D.C. Cir. 1997) (quoting 18 U.S.C. § 3582(c)). None of these exceptions apply to Ayers's case, and the Court is therefore barred by § 3582 from resentencing Ayers "in the interests of justice."

First, the BOP has not filed a motion requesting modification of Ayers's sentence, and the government has actively opposed Ayers's § 2255 motion.

Second, there is no statutory hook for Ayers's request. Rule 35 does not apply here, since the fourteen-day window to seek correction of a clear error has long passed, and since Ayers has not rendered the government substantial assistance. <u>See</u> Fed. R. Cr. P. 35(a)–(b)(1). Ayers has

not pointed to any other statute that would permit modification of his sentence. See Def.'s Br. at 12–14; Def.'s Reply at 9. The habeas statute under which Ayers is suing allows a court to modify a sentence on grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Other than Ayers's Sixth Amendment-based IAC claim, none of these bases for sentence modification applies here. Cf. United States v. Bailey, 777 F.3d 904, 906 (7th Cir. 2015) ("Several other circuits have read the phrase 'expressly permitted by statute' as disallowing sentence modifications unless resentencing has been ordered after a successful direct appeal under 18 U.S.C. § 3742(f), (g), or a collateral attack under 28 U.S.C. § 2255.").

Third, there is no applicable reduction in the Sentencing Guidelines. The D.C. Circuit has held that § 3582(c)(2)—which allows for resentencing of a defendant "based on a sentencing range that has subsequently been lowered by the Sentencing Commission"—applies to Rule 11(c)(1)(C) agreements when the sentencing judge's decision to accept the plea was based in some way on the Guidelines. United States v. Epps, 707 F.3d 337, 352 (D.C. Cir. 2013).[9] However, the Guidelines amendments prompted by the Fair Sentencing Act were made retroactive only to the date of the Act's passage: August 3, 2010. See Dorsey v. United States, 567 U.S. 260, 281–82 (2012). And Ayers does not argue that Peterson was ineffective because seeking a continuance would have

---

[9] The circuits are split 10–2 over whether to follow the plurality opinion in Freeman v. United States, 564 U.S. 522 (2011), on this point, as the D.C. Circuit and the Ninth Circuit have, or to follow Justice Sotomayor's concurring opinion, which would only allow for resentencing if the plea agreement itself had expressly used the then-existing Guidelines as the basis for the agreed-upon sentence. See Petition for a Writ of Certiorari at 5, 16–18, Hughes v. United States, No. 17-155 (U.S. July 27, 2017). The U.S. Supreme Court is set to resolve the split this Term. See Hughes v. United States, 138 S. Ct. 542 (2017) (mem.) (granting certiorari). Because no Guidelines amendments apply to Ayers, however, resolution of this issue either way will not affect this case.

18

allowed him to later seek resentencing directly under the FSA Guidelines and § 3582. Therefore, none of the three exceptions to the general prohibition on resentencing apply to Ayers.

Ayers does not acknowledge or engage with § 3582, but rather cites two cases in which appellate courts remanded cases for resentencing in the interests of justice because of a party's "confusion or misapprehension of the law." Def.'s Br. at 12–13. However, neither case is comparable to this one, nor does either's reasoning suggest that Ayers can circumvent § 3582. In the first, United States v. Bailey, the district court had sentenced the defendant after the FSA under a pre-FSA mandatory minimum, and Dorsey had since clarified that the old minimum did not apply; the Seventh Circuit determined that the defendant could not receive a sentence modification under § 3582, but that a § 2255 claim would be meritorious. See 777 F.3d at 907. The court determined "in the interest of justice" not to rule that the defendant had waived or forfeited a § 2255 claim. Id. at 908. The authority for this decision derived not from the courts' power to order resentencing but rather from the appellate courts' discretion to resolve issues on which the district court did not opine. See Singleton v. Wulff, 428 U.S. 106, 121 (1976).

In the other case, United States v. Collins, 433 F.2d 550 (D.C. Cir. 1970), the defendant had objected to his own lawyer's motion to have him committed for possible rehabilitative drug treatment, because the defendant mistakenly believed that agreeing to that disposition would strip him of his right to appeal, id. at 557. The D.C. Circuit found that it was "eventually . . . quite clear[]," after being informed that he would maintain his appeal rights, "that [the defendant] had been acting on a mistaken legal assumption which he was ready to abandon"—but the district court did not appear to have understood this when it sentenced him rather than committing him. Id. Therefore, "in the interests of justice," the court vacated the defendant's sentence and remanded for resentencing. Id. The court cited no authority for its ability simply to remand for resentencing

"in the interests of justice," but at least three important points distinguish Collins from this case. First, the district court itself was confused in Collins. Second, Collins was a direct appeal from an initial sentencing, rather than a § 2255 motion seeking resentencing. And third, Collins was decided over a decade before § 3582 became law and explicitly limited district courts' resentencing power. See Pub. L. No. 98-473, Title II, § 212(a)(2), 98 Stat. 1998 (1984). Neither case appears to help Ayers here. Hence, there is no basis for resentencing Ayers "in the interests of justice."

## IV. CONCLUSION

The Court recognizes that Ayers is, in some respects, a victim of poor timing. There is an inherent arbitrariness to being kept in jail longer because one received an agreed-upon sentence a month before the legal status quo changed in a way that might have worked in one's favor. But there was no firm indication at the time of sentencing that the FSA would soon pass, or that it would benefit Ayers if it did. In any event, Ayers had agreed to a particular sentence under Rule 11(c)(1)(C), which allowed him to argue only for concurrent sentencing rather than for a shorter prison term. Thus, even if the FSA had passed, Peterson's argument would have been very similar to the one she in fact made. For the reasons explained above, then, the Court finds that Peterson was not deficient under the Strickland test. The Court also finds that there is no basis for resentencing "in the interests of justice." Ayers's § 2255 petition will therefore be dismissed.

/s/
JOHN D. BATES
United States District Judge

Dated: May 8, 2018